UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID LEE JOHNSON,
a/k/a/ DAVID ALI SHABAZZ,

Plaintiff,

v.                                                    Case No. 18-C-1122

NICHOLAS SANCEZ, JOSEPH MILLER,
JASON ROSENTHAL, GABRIEL UMENTUM
CODY GOULD, JONATHON KOBZA, and
MICHAEL OLSON,

Defendants.

## DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

Plaintiff David Lee Johnson, who is representing himself, filed this action under 42 U.S.C.

§ 1983, alleging that Correctional Officers Nicholas Sanchez, Joseph Miller, Jason Rosenthal,

Gabriel Umentum, Jonathon Kobza, and Michael Olson violated his Eighth Amendment rights by

using excessive force when escorting him to the Restricted Housing Unit (RHU) while he was

serving a state sentence at Waupun Correctional Institution (WCI).  Johnson also claims that

Correctional Officer Cory Gould violated his rights under the Eighth Amendment by sexually

assaulting him during a strip search.  The case is before the court on Defendants' motion for

summary judgment.   Dkt. No. 34.  The motion will be granted.

## BACKGROUND

### A.  Preliminary Matters

Defendants note that Johnson failed to comply with this district's local rules governing

motions for summary judgment.  The record reflects that Defendants filed with their motion a

statement of proposed material facts as to which they claimed there was no genuine dispute and that entitled them to relief as a matter of law, as the local rule requires. Civil L.R. 56(b)(1)(C). Each factual assertion was supported by specific references to the affidavits, declarations, parts of the record, and other supporting materials. Defendants also provided Johnson with the warnings for pro se litigants and a copy of Rule 56 of the Federal Rules of Civil Procedure and Civil Local Rules 7 and 56(b), as required by Civil Local Rule 56(a)(1). Specifically, Johnson received the following warning:

> Plaintiff is further notified that declarations and any other documents accompanying this motion are incorporated by reference herein. Any factual assertion in the declarations (and other admissible proof) submitted or referred to in support of the defendants' motion will be accepted by the judge as true unless you submit affidavits or declarations or other admissible documentary evidence contradicting such assertion. Failure to oppose the defendants' declarations (or other admissible proof) with your own affidavits or declarations (or other admissible proof) may result in entry of judgment against you.

Dkt. No. 34.

Despite this warning and a copy of the rules explaining what was required, Johnson filed only a brief, with four exhibits attached, in response to Defendants' motion. The brief disputes a few statements from Defendants' declarations and lists nine allegations. Dkt. No. 46 at 3–6. The exhibits consist of two screenshots from the video footage Defendants produced in support of their motion and two unidentified documents concerning how to conduct a strip search and the Prison Rape Elimination Act. *Id.*; Ex. A–D. However, Johnson has filed no affidavit or declaration attesting to facts inconsistent with those set forth in Defendants' declarations. Even as to the few proposed facts he disputes in his brief, Johnson offers no reference to evidentiary materials to support his version of events. This is a violation of not only Civil Local Rule 56(b)(2)(B), but also Rule 56(c)(1) of the Federal Rules of Civil Procedure.

2

Because Johnson did not submit any affidavits, sworn declarations, or other admissible documentary evidence contradicting the assertions in the declarations submitted by Defendants, Defendants' proposed findings of fact are accepted as true. Although district courts are entitled to construe *pro se* submissions leniently and may overlook a plaintiff's noncompliance by construing the limited evidence in a light most favorable to the plaintiff, there is no requirement that they do so. *Gray v. Hardy*, 826 F.3d 1000, 1005 (7th Cir. 2016); *see also Stevo v. Frasor*, 662 F.3d 880, 887 (7th Cir. 2011) (recognizing that district courts are entitled to insist on strict compliance with the local rules). Here, Johnson was provided notice of the consequences of not submitting evidentiary materials contravening Defendants' version of the events in question and failing to respond to their proposed findings of fact. He is an experienced litigator with nine cases commenced in this district since 2002 and offers no explanation for why he failed to comply with the procedure governing summary judgment. Johnson was no longer in custody at the time Defendants filed their motion. Under these circumstances and given the nature of his allegations against Defendants, the court will not overlook his noncompliance. Defendants' proposed findings of fact are therefore deemed true.

### B. Parties

At the time of the relevant events, Plaintiff David Lee Johnson was an inmate at Waupun Correctional Institution. Dkt. No. 35 ¶ 1. He has since been released from custody. *Id.* Johnson describes himself as completely deaf in his right ear and blind in his right eye and suffers from 60% loss of hearing in his left ear. Dkt. No. 46 at 1. He also says he has arthritis in both his knees, requiring patella braces and a back brace. *Id.* He states he had these conditions on June 27, 2018. *Id.*

3

Defendants Michael Olson, Joseph Miller, Jason Rosenthal, Gabriel Umentum, and Johnathon Kobza were all correctional officers at Waupun. Dkt. No. 35 ¶ 2. Defendant Cody Gould was a correctional sergeant, and Defendant Nicholas Sanchez had the title of "Supervising Officer 1." *Id.* ¶¶ 3–4. All of the defendants have undergone training on the policies and procedures of "The Principles of Subject Control" (POSC). POSC is a system of verbalization skills, coupled with physical alternatives designed to enhance safety and security for all inmates and staff at a correctional institution. The training provides techniques to control inmates who are physically and passively resisting security officers and help determine if and when force should be utilized. *Id.* ¶ 7.

## C. Johnson's Transfer to RHU

On June 27, 2018, at approximately 5:45 p.m., while working at his assigned post observing recreation movement from the South Cell Hall, Sanchez noticed that Johnson had his pant legs rolled up to his knees and directed him to wear his pants correctly. *Id.* ¶¶ 8–9. Johnson became argumentative, stating he could not fix his pants because he was borrowing them. *Id.* ¶ 9. Sanchez ordered Johnson twice more to pull down his pant legs and wear them correctly. At that point, "Johnson took off his shoes and pulled his pants from the waist down to his feet, so he was standing in front of Sanchez in just his underwear." *Id.* ¶¶ 9–10. Johnson was given six directives to pull his pants up, but refused, shouting at Sanchez, "You wanted me to pull my pants down, so I did!" *Id.* ¶ 11. Johnson eventually complied and pulled his pants up, but only after creating a disturbance that interfered with the security staff's ability to monitor inmate movement to recreation. *Id.* ¶¶ 12–13.

As a result of his "disruptive behavior" and refusal to comply with Sanchez's orders, Sanchez told Johnson he would be placed in Temporary Lock Up (TLU) in RHU. *Id.* ¶ 14.

4

Sanchez directed Johnson to put his hands behind his back so Defendant Miller could handcuff him. *Id.* Johnson complied but became agitated as he did so, yelling "You can't lock me up," "I just got out of 30 days room confinement," and "This is bullshit, you are all racist." *Id.* ¶¶ 14–15. Defendant Olson secured Johnson's right arm and Defendant Miller secured Johnson's left arm. *Id.* ¶ 16. Then they began to escort Johnson to RHU, but because Johnson continued to yell at staff, calling them racist, and refusing orders to face forward, Sanchez directed officer Ricardo Sanchez (not a defendant) to secure his head "by placing a bladed hand on Johnson's chin and a bladed hand on Johnson's forehead, covering his eyes." *Id.* ¶¶ 17–18. With Johnson secured, the officers then walked Johnson backwards towards RHU. *Id.*

Officers are trained to view an inmate's head as a potential weapon the inmate can use to strike and injure them. It is for this reason that they attempt to control the inmate's head and keep him facing forward. Forcing the inmate to walk backwards is also a way of keeping an unruly inmate off-balance, maintaining control, and preventing the inmate from causing harm. It also allows the guard to bear the inmate's weight more easily if he utilizes "dead weight tactics" by refusing to walk and lowering his center of gravity. These are tactics described in the POSC.

As they proceeded with the escort, Johnson utilized dead weight tactics and refused to walk, which made it difficult for them to escort him to RHU. *Id.* ¶ 22. Sanchez ordered the escorting officers to "stabilize him against the fence" and wait for a restraint chair. *Id.* ¶ 23. Defendant Gould brought the restraint chair to the fence where Johnson was stabilized, and Defendants Umentum and Kobza came to assist in placing Johnson in the restraint chair. *Id.* ¶ 26. Olson was then relieved of his duties and left the area. *Id.* Johnson resisted the efforts to place him in the restraint chair. *Id.* ¶ 27. In order to gain compliance, Sanchez removed his taser and

placed it on Johnson's left shoulder. *Id.* ¶ 28. Johnson then complied and was secured in the chair without Sanchez using his taser. *Id.* Johnson was then escorted to RHU. *Id.* ¶ 30.

### D. The Strip Search

A strip search is a search in which the inmate is required to remove all clothing to allow examination of the clothing and body, including a visual examination of body cavities. Strip searches are conducted in a clean and private place by at least two staff, one of which is of the same sex. Strip searches are considered critical to the security of a correctional institution. They are a means to identify and confiscate contraband possessed by inmates, prevent contraband from entering the prison or being moved from one location to another, and to identify articles used to assault a correctional officer or another inmate, or to engage in self-harm.

When an inmate refuses to cooperate with a strip search, staff conduct a staff-assisted strip search instead of following the normal procedure. A staff-assisted strip search is conducted while the inmate remains restrained and two officers maintain hands-on control of the inmate by holding onto his arms. A third officer then cuts off the inmate's clothes and then the search is conducted. *Id.* ¶¶ 31–35. The staff member conducting the search visually inspects the inmate's body from top to bottom, "including checking under the inmate's armpits, under his testicles, between his buttocks, and the bottoms of his feet." *Id.* ¶ 35. A two-finger bladed technique is used, and gloves are worn. While the officer must physically touch an inmate's testicles and buttocks, the contact is brief. *Id.* During the search, the officer explains what he is doing. *Id.*

When they arrived at RHU, Sanchez asked Johnson if he would comply with a strip search. Johnson responded with an expletive and refused to give a direct answer. After several attempt to elicit a direct response, Sanchez took Johnson's response as a refusal to cooperate. Sanchez then ordered Gould to conduct a staff-assisted strip search. *Id.* ¶ 40. Sanchez told Kobza to video the

search and had Rosenthal put Johnson in leg-restraints. *Id.* ¶ 41–42. At that point, Johnson refused to stand and "employed dead weight tactics." *Id*. ¶ 41. Johnson was also shouting verbal assaults and physically resisting attempts to restrain him, so Miller secured Johnson's right arm and Umentum secured his left arm using compliance holds. *Id.* ¶ 42. Johnson then complied and stood up, so Miller and Umentum released their compliance holds. *Id.* Johnson then began to move his head, twist his body, and lift his feet, so after several warnings, Rosenthal placed his hands on Johnson's head. *Id.* ¶ 44.

Johnson was then secured to the strip cell door and Gould began his search, removing Johnson's clothes with the Dura-Shears. *Id.* ¶ 46. Gould did not cut Johnson's braces or compression socks; instead staff assisted Johnson to his knees and removed them. *Id.* ¶ 47. Gould then searched Johnson while Rosenthal verbalized each step of the process. *Id.* ¶ 48. Using the bladed hand technique described above, Gould searched Johnson's feet, armpits, mouth, hair, genitals, and buttocks. *Id.* Gould did not find any contraband. *Id.* Johnson was then wrapped in a privacy wrap. *Id.* ¶ 54.

At that point, Johnson began swinging his leg back-and-forth. *Id.* ¶ 56. Sanchez told Johnson several times to stop swinging his leg, and when he did not comply, Sanchez took out his taser, placing it on Johnson's shoulder blade. *Id.* ¶ 57. Once Johnson calmed down, Sanchez put the taser away without deploying it. *Id.* ¶ 58.

Nurse York (not a defendant) then arrived to examine Johnson. *Id.* ¶ 60. She cleaned and bandaged the cuts on Johnson's knees that he sustained during the escort to RHU. *Id.* She also took his vitals. *Id.* Once Nurse York medically cleared Johnson, Sanchez directed Rosenthal to remove the tether strap restraining Johnson to the door and escort him to a cell in controlled status because Johnson continued to be verbally combative. *Id*. ¶¶ 63–64. While the officers were

7

escorting Johnson, he refused to walk, again becoming dead weight. *Id.* ¶ 66. Sanchez unholstered his taser and put it on Johnson's left shoulder to gain compliance. *Id.* Rosenthal then secured Johnson's head and the officers turned to walk backwards towards control-status cell A222. *Id.* ¶ 67. Once the officers got to the cell, they removed Johnson's restraints and privacy wrap, giving him only a security mat, and secured him in the cell without incident. *Id.* ¶¶ 64, 69–70. Sanchez states it was in his discretion to limit property and put Johnson in controlled status because of his disruptive behavior. *Id.* ¶ 64. Sanchez told Johnson that "his actions would dictate how long he would remain in controlled status and the property he would receive." *Id.* ¶ 71. Defendants state that "at a later time," though they do not specify when, Johnson was given a security kilt. *Id.*

Johnson does not address much of what happened after the strip search concluded. He states that when moving him to the controlled-status cell, he was put in a choke hold. Dkt. No. 46 at 7. He then states that he was left in the cell naked without a mattress, linens, or toilet paper for 24 hours. *Id.* at 3.

### E. Video

The court also has the benefit of the video that Defendant Kobaz recorded. Dkt. No. 36-4. The video has audio. It begins showing Johnson in a restraint chair and Defendants' efforts to remove him. *Id.* at 0:01–1:10. The officers ask Johnson about a strip search and Johnson does not answer. *Id.* It also shows that Johnson was agitated and yelling and resisting officer commands while the officers were repeatedly telling him to relax and asking him to put his legs down. *Id*. at 1:10–1:55. Johnson can be heard complaining about his arm being restrained and informing the officers that he is blind and cannot see. *Id.* 2:00–2:30. The officers then calmly explain to Johnson that they will be cutting off his clothes, and Johnson continues to verbally resist and is argumentative, taking issue with being brought to RHU. *Id.* 2:50–7:20. As they remove his clothes

8

and braces, the video shows Johnson attempting to physically resist as well, informing the officers that he can take his own braces off. *Id.* Johnson also tells them he is bleeding. *Id.*

The officers then announce the strip search. *Id.* at 9:04. While the view of Johnson is partially obscured, an officer wearing a dark hat, presumably Defendant Gould, quickly runs his hands over Johnson's body. *Id.* at 9:04–10:09. The whole search appears to last approximately one minute, and an officer is narrating the search the entire time. *Id.* While Sanchez does appear to have his taser out, at no point does he deploy it. *Id.* And even though the search does not take place inside the strip cell, several officers are surrounding Johnson, shielding his body. *Id.* During the search, there do not appear to be any females present. *Id.* After the search, and after Johnson is given the privacy wrap, Nurse York, who is a female, examines him. *Id.* 10:35–17:45. The video shows her dressing Johnson's wounds on his knees and checking his vitals. *Id.*

The video also shows the officers escorting Johnson to the controlled-status cell. *Id.* 17:46–19:20. Johnson does appear to be using what Defendants termed "dead weight" tactics, but he is also complaining that his legs hurt and that is why he cannot properly walk. *Id.* He is agitated and yelling when the officers are shown to restrain his head and move him into a backwards walking position. *Id.* The officers remain calm the entire time and cautiously move Johnson up the stairs into the cell unit. *Id.* At no time is Johnson struck or threatened. The video shows Johnson placed in Cell A222 without incident. *Id.*

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A

9

dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could

return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of

the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party

opposing the motion for summary judgment must "submit evidentiary materials that set forth

specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932,

937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show

that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly

entered against a party "who fails to make a showing sufficient to establish the existence of an

element essential to the party's case, and on which that party will bear the burden of proof at trial."

*Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### A. Eighth Amendment Excessive Force Claim Against Sanchez, Olson, Miller, Rosenthal, Umentum, and Kobza

Under the Eighth Amendment, correctional officers violate an inmate's constitutional

rights "when they use force 'maliciously and sadistically for the very purpose of causing harm,'

but not when they apply it in good faith to maintain or restore discipline." *Jackson v. Angus*, 808

F. App'x 378, 382 (7th Cir. 2020) (quoting *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)). "Whether

a guard applies force in good faith to resolve a disturbance or, rather, maliciously with intent to

cause harm, turns on factors including the threat reasonably perceived by the guard, the need for

and the amount of force used, and the injury suffered by the prisoner." *Boyd v. Pollard*, 621 F.

App'x 352, 355 (7th Cir. 2015).

Johnson claims there are three times where Defendants Sanchez, Olson, Miller, Rosenthal,

Umentum, and Kobza violated his constitutional rights by using excessive force during the course

of escorting him to RHU. First, he asserts he was put in a headlock, he was dragged to a fence on

10

the way to RHU where Miller and Olson secured his arms, and Sanchez ordered an officer to place him in a headlock and jam his face up against the fence while Sanchez placed a taser on his shoulder blades. Johnson then alleges they dragged him the rest of the way to RHU, causing his knees to bleed. Second, Johnson states Defendants, though he does not specify which ones, forced him up against the door of the strip-search cell and placed him in another head lock. Third, after the strip search, Johnson alleges Defendants put him in a choke hold and dragged him to cell A222 in RHU. As noted above, however, Johnson offers no admissible evidence supporting his claims and they are refuted by the declarations and proposed findings of fact submitted by Defendants. This alone is enough to establish Defendants' right to summary judgment on each of Johnson's claims.

In addition, the court has the benefit of video evidence for the second and third instances, though the first instance was not caught on camera. The video demonstrates that, during the second and third instances, Defendants did not use excessive force against Johnson. The controlled force they used was applied in good faith to gain Johnson's compliance. The video shows Johnson was agitated during these events, resisting commands, arguing with Defendants, and calling them names. It also shows he was physically resisting the restraints, requiring Defendants to stabilize him, his head in particular. Additionally, Defendants' demeanors were calm, cool, and collected, and while Sanchez did remove his taser and place it on Johnson, the video shows he never deployed it. The restraint holds, what Johnson characterizes as head locks and choke holds, do not appear to be egregious or executed in a malicious or sadistic manner, but seem necessary given Johnson's attempts to physically resist restraint. Also, while Johnson states he was tased, the video shows no evidence of a taser being deployed. As such, the video blatantly contradicts Johnson's version of events for the second and third alleged instances of excessive force and dispels any notion that

11

Defendants used excessive force in these two instances. *See Scott v. Harris*, 550 U.S. 372, 378 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment.").

The first instance of excessive force—when Defendants stopped at the fence on the way to RHU—was not caught on camera; however, where a factfinder has video showing a prison official's conduct was proper for part of an incident, the factfinder can reasonably infer that the prison official's conduct was proper for the entire incident. *Boyd*, 621 F. App'x at 355–56. The circumstances in *Boyd* are analogous to the circumstances at issue here. The plaintiff in *Boyd* contended that a guard body slammed him and choked him, leaving him unconscious and bleeding profusely from his head. *Id.* at 353–54. The guard maintained that the plaintiff was physically resisting a cell extraction and used the amount of force necessary to gain the plaintiff's compliance. *Id.* at 354. The video in that case did not show the plaintiff's and the guard's entire interaction, but the Seventh Circuit concluded that, because the video demonstrated the guards' professional behavior for part of the interaction and because the plaintiff only sustained minor injuries, "no juror who viewed the video could reasonably conclude . . . that the guards, when outside the camera's view, attacked [the plaintiff]." *Id.* at 356.

Similarly, the video at issue here shows that Defendants acted in a professional manner, using only the force necessary to gain Johnson's compliance. They even had a nurse come to the scene, bandage his knees, and check his vitals before placing him in a cell. Accordingly, a factfinder can reasonably infer that Defendants had acted just as professionally and with as much restraint prior to being filmed. Also, while the video does not show the initial escort to the strip-search cell, it does contain elements that corroborate Defendants' story and blatantly contradict

12

Johnson's version of events. The video clearly shows Johnson in a restraint chair when he arrived at the strip-search cell, contrary to Johnson's assertion that, after he was pressed up against the fence, he was then dragged to RHU. Even without relying on the video, taking the facts in a light most favorable to Johnson, the force Defendants allegedly used in this first instance was not malicious and sadistic and, at best, Defendants roughed Johnson up a little while escorting him to RHU. This does not rise to the level of a constitutional violation. *See Guitron v. Paul*, 675 F.3d 1044, 1046 (7th Cir. 2012) ("Custodians must be able to handle, sometimes manhandle, their charges, if a building crammed with disgruntled people who disdain authority . . . is to be manageable."). Summary judgment is granted in favor of Defendants on this excessive force claim.

**B. Eighth Amendment Excessive Force (Sexual Assault) Claim Against Gould**

Johnson was also allowed to proceed on an Eighth Amendment claim of sexual abuse solely against Defendant Gould for the manner in which he conducted his strip search of Johnson. "The Eighth Amendment prohibition on cruel and unusual punishment bars prison authorities from unnecessarily and wantonly inflicting pain on inmates." *Rivera v. Drake*, 497 F. App'x 635, 637 (7th Cir. 2012). Specifically, "[i]n the context of searches of prisoners, only searches that are maliciously motivated, unrelated to institutional security, and lack a legitimate penological justification violate the Eighth Amendment." *Id.* This includes a prison official "performing some action that is 'intended to humiliate the victim or gratify the assailant's sexual desires.'" *Gillis v. Pollard*, 554 F. App'x 502, 505 (7th Cir. 2014) (quoting *Washington v. Hively*, 695 F.3d 1044, 1046 (7th Cir. 2012)).

Johnson alleges that Gould "fondled his testicles" but other than this assertion, there is nothing in the record demonstrating that Gould touched Johnson to humiliate him or gratify some

13

sexual desire. Critically, Johnson has offered no evidentiary support, either by affidavit or by sworn declaration, supporting his allegation. Absent such support at the summary judgment stage, his claim fails. *See Spring v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (noting "summary judgment is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events").

Johnson points to the search procedures as evidence that Gould violated his rights, but he does not explain how Gould violated the search procedures. Because he did not voluntarily comply, a staff-assisted strip search was conducted, requiring additional staff. Further, the video demonstrates the search was perfunctory, lasted less than a minute, with contact near Johnson's private areas lasting mere seconds. Based on the record, no reasonable factfinder could conclude that Gould conducted the search in any manner other than to carry out a required staff-assisted strip search before admitting Johnson into RHU.

Johnson also asserts that the strip search violated his constitutional rights because it was conducted out in the open and in front of both males and females. The video flatly contradicts Johnson's version of events. While it is true that Johnson was not searched inside the cell, he had several officers shielding his body from view. Additionally, there do not appear to be any females present while he is naked. Johnson argues that a still photo from the video shows a female present, but this appears to be Nurse York examining him, which took place after the search ended and Johnson was covered by a privacy wrap. However, even if there were, "the strip search of a male prisoner in front of female officers, if conducted for a legitimate penological purpose, would fail to rise to the level of an Eighth Amendment violation." *Calhoun v. DeTella*, 319 F.3d 936, 939 (7th Cir. 2003). No reasonable factfinder could conclude that the strip search was not conducted

14

for a legitimate penological purpose. Thus, summary judgment will be granted in favor of Gould on this claim as well.

## C. Conditions of Confinement

In his brief in opposition to Defendants' motion for summary judgment, Johnson argues that Defendants also violated his Eighth Amendment rights when they were deliberately indifferent to his mental health needs and when they left him naked in a cell without bedding or toilet paper for 24 hours. Dkt. No. 46 at 3. The magistrate judge who screened Johnson's complaint did not identify these as separate claims (Dkt. No. 13), and Defendants have therefore not addressed them. The complaint does not allege a denial of mental health care, so there is no reason to address Johnson's argument in his brief on that issue. No such claim was stated. But the complaint does allege that, after the strip search was completed, Johnson was placed "in a cell with no mattress, linen covers, no toilet paper, [where] he layed [sic] naked on a concrete slab for 24 hrs." Dkt. No. 1 at 4.

In *Buford v. Sutten*, the court held that forcing an inmate to sleep naked on the floor for more than 24 hours did not constitute cruel and unusual punishment. No. 04-C-959-C, 2005 WL 756092, at *8 (W.D. Wis. Mar. 29, 2005). In so holding, the court noted that there was no allegation that the cell lacked heat or was unsanitary. "Given the short period of time petitioner has alleged he was left without clothes," the court concluded, "I cannot infer that respondent Kingston or his staff put petitioner's health or safety at risk." *Id.* The same court likewise held in *Aney v. Gilberg* that the allegation that an inmate was placed in his cell naked for twelve hours did not state a claim under the Eighth Amendment. No. 20-C-131-C, 2002 WL 32340878, at *1 (W.D. Wis. Apr. 22, 2002). Here, too, there is no allegation that Johnson suffered more than the

discomfort of sleeping on a hard surface. Such temporary discomfort, without more, is insufficient to state a claim.

It should be noted, however, that in *Gillis v. Litscher*, the Seventh Circuit held that a Behavior Modification Plan (BMP), stage one of which involved placing the inmate naked in his cell for a minimum period of three days with no bedding or other property and only nominal access to toilet paper, may amount to an Eighth Amendment violation if it is shown that, in imposing such conditions, the defendants "acted with disregard of the substantial risk of serious harm to [the inmate]." 468 F.3d 488, 494 (7th Cir. 2006). Although Johnson alleges he was left naked in his cell for only 24 hours, the conditions described are somewhat similar to those described in *Gillis*.

The Eighth Amendment protects more than an inmate's physical health and safety. It also protects his dignity as a human being. *Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man."); *Hope v. Pelzer*, 536 U.S. 730, 738 (2002) ("The use of the hitching post under these circumstances violated the 'basic concept underlying the Eighth Amendment[, which] is nothing less than the dignity of man.'") (quoting *Trop*, 356 U.S. at 100). Forced nudity can degrade and humiliate a prisoner and denying him toilet paper to clean himself off only adds to the degradation, though here there is no allegation that Johnson ever requested toilet paper.

To be sure, there are reasons for taking away an inmate's clothes, such as when he repeatedly destroys them or there is reason to believe he might harm himself by fashioning them into a noose. Defendants contend here that Johnson was agitated when they placed him in his cell, but there is no suggestion that he was suicidal. It appears instead that he may have been agitated at least in part because his clothes were taken away. One does not need a degree in psychology to realize that a person's behavior is usually responsive to the way in which he is treated. Civilized

16

or humane treatment encourages civilized or humane behavior. By the same token, a person who is unnecessarily treated as less than human frequently acts accordingly.

Defendants have offered no reason for denying Johnson clothing once the strip search was completed or why he was not given toilet paper. Of course, they can hardly be faulted for such failure since the screening order did not identify a conditions-of-confinement claim to which a response was required and Johnson's complaint contains only a bare allegation that has been found insufficient to state a claim. But this is not to say that treating an inmate in this way does not raise serious concerns. The Department of Corrections should carefully consider whether the kind of forced nakedness described in this case serves any penological purpose. Too often, it appears it does not. *See, e.g.*, *Gruenberg v. Gempeler*, 740 F. Supp. 2d 1018, 1023 (E.D. Wis. 2010) (questioning why restrained inmate was left naked and uncovered). Where it is not necessary, it may subvert the very purposes prison is intended to serve, even if it does not amount to cruel and unusual punishment.

## CONCLUSION

In any event, for the reasons set forth above, Defendants' motion for summary judgment (Dkt. No. 34) is **GRANTED**. The case is dismissed, and the Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 29th day of December, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge

17